**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 25, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2535**

**STATE OF WISCONSIN**

Cir. Ct. No. 2022ME18

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF J.A.K.:

WAUKESHA COUNTY,

    PETITIONER-RESPONDENT,

  V.

J.A.K.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Waukesha County: CODY J. HORLACHER, Judge. *Affirmed.*

¶1 GUNDRUM, P.J.[1] J.A.K., referred to herein with the pseudonym Janice, appeals from circuit court orders extending her involuntary commitment, pursuant to WIS. STAT. § 51.20, for twelve months and allowing for the involuntary administration of medication and treatment during that time. She asserts Waukesha County failed to present sufficient evidence to prove she is currently dangerous under § 51.20(1)(a)2. and the circuit court failed to make specific factual findings on dangerousness with reference to a subdivision paragraph of § 51.20(1)(a)2. as required by *Langlade County v. D.J.W.*, 2020 WI 41, ¶40, 391 Wis. 2d 231, 942 N.W.2d 277. She also asserts the County failed to present sufficient evidence to establish she is incompetent to refuse medication. We disagree on all points and affirm.

## BACKGROUND

¶2 On May 24, 2024, the County filed a petition for Janice's recommitment pursuant to WIS. STAT. ch. 51. The circuit court held a hearing on the petition, and the following relevant evidence was presented.

¶3 Waukesha County Health and Human Services clinical therapist Danielle Weber, a licensed clinical social worker whose licensing permits her to diagnose and treat mental illness, testified that Janice has a treatment team that includes psychiatrist Dr. Rada Malinovic, as well as the nursing staff who administer Janice's psychiatric medication injections. In conjunction with her testimony, Weber's "Evaluation and Recommendation for Recommitment" of

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

Janice was admitted into evidence without objection at the final hearing on the recommitment petition. The report summarizes Janice's treatment records.

¶4 Between her report and testimony, Weber presented evidence that Janice is diagnosed with schizophrenia and is prescribed Abilify, which she receives by injection approximately every eight weeks. Janice's initial commitment stemmed from a January 2022 petition for examination filed by the County and supported by petitioner questionnaires of Janice's three adult daughters as well as three of Janice's neighbors at her senior living apartment complex. The questionnaires were completed following concerning behavior by Janice, beginning with an incident in November 2021.

¶5 According to Weber's report, in November 2021, Janice was at a hotel waterpark and "was lifting the shirts of random adults and children to expose their backs, as she was checking for curves in their spines based on her paranoid and delusional beliefs." She was kicked out of the waterpark and later "became aggressive in the hotel room," pushing and shoving her daughter and son-in-law.

¶6 On December 30, 2021, Janice grabbed a female neighbor's arm and screamed at her, stating the neighbor knew where Janice's husband was "and that she needed to give him back," even though Janice's husband was deceased. Janice then went through the apartment complex "slamming doors and screaming that she was from another universe and that the residents must worship her or they would need to die." Later that day, Janice "charg[ed] towards her neighbor" while screaming that the neighbor took Janice's "boogers" and needed to give them back. The neighbor retreated to her apartment for safety, and Janet screamed outside the neighbor's apartment door for 10 to 15 minutes. Janice then went

down the hallway, slamming doors and "screaming that everyone must worship her."

¶7   A few hours later, Janice flipped over furniture in the lobby and threw cushions and Christmas decorations "while screaming that she needed to find her boogers." Janice followed a neighbor "outside the apartment complex and came right up to her screaming that she would cut off [the neighbor's] limbs and stating that [the neighbor] must die." The neighbor called the police due to fear of Janice. A male neighbor intervened, and Janice also threatened him, stating she "would remove his limbs." A few hours later, Janice pounded on the female neighbor's door and yelled at the neighbor. Janice was later screaming in the parking lot and out her apartment window. Her screaming included stating, "I have got my gun loaded," which neighbors interpreted as a threat "that she was going to start shooting." "The apartment manager indicated that the neighbors were very scared …."

¶8   Weber's report details other erratic and concerning conduct and verbalizations by Janice. One of Janice's adult daughters "expressed fear that her mother would potentially set fire to [the daughter's] home in her current psychiatric state, as [Janice had] ask[ed the daughter] if she had home owner's insurance because [Janice] wished [her] house would burn down."

¶9   According to the report, Janice insists she does not have a mental illness and repeatedly states she does not want to receive medication and will not take such if not ordered by the court. Janice has failed to report for medication management several times, only to report later, accompanied by an adult daughter. An adult daughter reported that Janice was stable, "doing well," had improved, and was "functioning better on medications than she did when off of medications."

4

The report indicates Malinovic "regularly engages [Janice] in conversation regarding the advantages, disadvantages, benefits, and risks of her medications, as well as alternative[s] to her medications," with the last discussion as to advantages and disadvantages occurring on April 12, 2024, less than two months before the final hearing on this petition. The report notes Malinovic's opinion that Janice has demonstrated poor insight into her illness and need for medication.

¶10     Weber testified Janice had not engaged in any new dangerous conduct since being on the injectable medication, adding, "The medication is holding her symptoms and allowing her to remain independent in the community." Since being on medication, Weber further explained, Janice has not had contact with the police or faced eviction from her apartment and her daughters report Janice "is doing well; that she is engaging in family outings and engaging and acting appropriately with family and members of the community."

¶11     Weber testified that during Janice's meetings with outpatient providers in the two years since her initial commitment, Janice has never expressed insight as to her need for medication to treat her mental illness. Weber added that Janice

> regularly presents at the appointments stating that she wants off of the medication because she's not mentally ill and does not need it. She's often reporting somatic complaints[2] or side effects from medications that are not visible. Most recently over the past few appointments she's had with Dr. Malinovic, she's come reporting rashes on her face that are not visible to either her adult daughter or Dr. Malinovic.

---

[2] Weber explained that "somatic complaints" "are anxieties that we believe that we are having a reaction to something that isn't actually there, and it causes individuals to focus on those."

Weber confirmed that Malinovic "routinely discuss[es] the advantages, disadvantages, and alternatives of Abilify" with Janice.

¶12    On cross-examination, Weber stated she had personally met with Janice once or twice in the two years she had been overseeing Janice's commitment. She acknowledged that Janice's dosage of Abilify was at some point decreased because of adverse side effects. She stated that she knows Malinovic regularly has conversations with Janice about the advantages, disadvantages, and alternatives to medication because of her review of the records as well as her direct conversations with Malinovic, but she did not recall if she had ever been present during such conversations "or when it would've taken place." Weber agreed Janice has been compliant with attending appointments and receiving her injections but added, "[w]ith the assistance and support of her adult daughters."

¶13    Upon questioning from the circuit court about only having met with Janice twice in two years, Weber explained that her role is essentially one of oversight to ensure Janice "is being compliant with receiving her injection."

¶14    Psychiatrist Dr. Michele Andrade testified that she was appointed by the circuit court to conduct an examination of Janice, which she did on May 31, 2024, less than a week before the final hearing. She conducted the one-hour examination by phone, because Janice would not agree to a meeting by Zoom. Prior to testifying, Andrade had also reviewed the petition for recommitment and "an in-depth and lengthy history … of [Janice's] symptoms and behaviors and hospitalizations since her initial commitment."

¶15    According to Andrade, Janice suffers from "[s]chizophrenia, chronic paranoid, type severe," which is a substantial disorder of thought, mood, and

perception. Andrade agreed Janice's illness grossly impairs her judgment and behavior and "ha[s] an impact on her reality." Janice

> consistently and even presently, when I had spoken with her, denied any sort of mental illness or any symptoms….
>
> She believed that her medication was poisoning her. She … had a lot of somatic delusions. That she believed the medicine that she was taking was causing her[:] the inability to read and write, the inability to open her eyes, the inability to walk … [and] psoriasis on her face.
>
> …[T]here were quite a few other somatic complaints that she had, and she related those to her medication.

Andrade added that "[t]he delusions about her somatic complaint are actually symptoms—real symptoms of schizophrenia. She has presented over the phone as unable to distinguish the reality between those somatic complaints [and] … the benefits of her taking medication."

¶16 Andrade stated that Janice "ha[d] been aggressive when decompensated[] and that has improved with medications. She ha[d] threatened to … cut the limbs off of her neighbor." "[S]he had asked the police to kill her…. She asked the nurses, while she was in the hospital, if they would care if she died. She asked her daughter if her daughter had insurance on her house because she wanted to burn it down." Andrade expressed concern about Janice "going to strangers and lifting their clothing up, to check to see if they had a curvature in their spine" because it is not only "[j]ust very odd and bizarre kind of behavior" but also makes Janice vulnerable "because you don't know what a stranger is going to do when you're essentially assaulting them by lifting their clothing up … unwanted and unannounced."

¶17 Andrade confirmed that medication is necessary to improve Janice's thought, mood, and perception, it is in fact having therapeutic value for Janice, and

due to her schizophrenia, Janice is incapable "of applying her condition to whether she should take Abilify." She also confirmed that she explained to Janice the advantages and disadvantages of the medication but stated she did not explain any alternatives. She stated that Janice told her "she was intending to stop any medication if she was not on court order because she didn't believe she had a mental illness or a need, and that the medications were poisoning her." Andrade explained that Janice's "medication is benefiting not only her but [also] the community, by reducing the incidences of either dangerousness or potential dangerousness." Andrade indicated that if the commitment is not extended, and thus treatment is withdrawn, it is much more likely than not that Janice "would become significantly symptomatic." Andrade explained that "[o]ften times … with repeated episodes of ceasing medication and resulting decompensation, it becomes harder and harder … on the next trial of treatment and medication, to get back to a level of health and well-being that was previously seen."

¶18 On cross-examination, Andrade agreed that her testimony as to Janice asking her daughter about the house insurance, her daughter's related fear of Janice burning down her house, and Janice asking to be killed were based on Weber's report and not statements Janice made to Andrade directly. Andrade explained that her record review of Janice's history was based on Weber's report and the petition. She explained she did not discuss "the alternatives to medications" with Janice "[b]ecause I don't believe there are any alternatives to treatment for schizophrenia. There [is] complementary help often given but medications are the treatment for schizophrenia." Andrade acknowledged that Janice had been medication compliant but added that she has been compliant "as long as she has been on court order." Andrade agreed that Janice's medication dosage had been decreased at some point.

¶19 Andrade's report, which was admitted into evidence without objection, references the concerning conduct and statements by Janice noted in Weber's report. Andrade's report notes Andrade's concern that Janice's "history of inappropriate behavior to strangers leav[es] herself vulnerable to potential defensive actions by strangers." It states that Janice is a proper subject for treatment and "is dangerous" under the second and third dangerousness standards, based on the recommitment alternative of WIS. STAT. § 51.20(1)(am), and it details all of the standards. Andrade's report indicates that "medication or treatment [will] have therapeutic value" for Janice and details that Andrade explained to Janice the advantages of the recommended medication, those being "[l]essen[ing] hallucinations/delusions/aggression," and the disadvantages, those being "w[eigh]t gain, sedation, movement abnormalities, NMS." The report further indicates that due to her mental illness, Janice is "incapable of expressing an understanding of the advantages, disadvantages and alternatives to accepting the recommended medication or treatment," explaining that "among other somatic complaints, [Janice] feels medication prevents her from opening her eyes. Per records, she has never had an issue with opening her eyes." The report provides that due to her mental illness, Janice is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to … her condition in order to make an informed choice as to whether to accept or refuse the recommended medication or treatment," further explaining that Janice "[d]oesn't feel she has a mental illness so [she has] no need for medications which she feels are poisoning and killing her." The report explains that

> if treatment were to be withdrawn, [Janice] would quickly become again a proper subject for treatment due to decompensation of her chronic and persistent mental illness. She lacks insight into need for treatment due to mental illness and has expressed to [Andrade] and others, her intent to stop medications if not on court ordered

treatment/medication. [Janice] has shown her inability to take medications voluntarily and has become aggressive in a delusional state when not taking medication which then leads to decompensations. [Andrade] opines that it is essential to continue court ordered treatment and medication for safety of community, family and herself.

¶20 Following the close of evidence, Janice made an unsworn statement that "[m]ost of … what they said were lies about what I had said," and "I'm under this medication for no reason at all, and I'm suffering and being tortured every single day. I don't even know if I'm going to wake up tomorrow. That's how serious this medication is."

¶21 The circuit court stated that "it's unrefuted that [Janice] suffers from schizophrenia."[3] The court noted there was

no testimony really refuting what the … two witnesses have testified [to] today … and the history of what brings us here today: from the underlying reports of the incident at the waterpark, the history of delusions and hallucinations. We have from [Janice] herself that she doesn't think that she's got schizophrenia, that she doesn't [need] medication.

The court stated:

I do find, taking on its face value, what has been testified to by the two witnesses today, even with the

---

[3] The circuit court made some preliminary comments indicating this was

kind of a weird [case] because quite frankly having the testimony of the social worker … who only met with [Janice] for twice now, out of two years, and yet speaking to the dangerousness is heavily scrutinized by this [c]ourt as it should be. And the fact that the attending physician that was testifying today had a one-hour long phone conversation. And quite frankly the rest of her testimony also, not stellar.

The court also expressed that "[i]t is odd" and "positioned differently than anything else I've seen" with the County "lessening the medications over time, in consultation with the family and yet continuing on with the [medication] order."

> minimal actual face-to-face contact, which this [c]ourt is concerned of, but, again, is [un]refuted[.] I do find that the grounds for the extension of commitment have been established. I do find, based on the statements of [Janice] today that she doesn't want to take the medications. She does not believe she has a mental illness, based off of the collateral source review that the other witnesses have testified to today and her behavior if she goes noncompliant with those medications, this [c]ourt does make the finding that [Janice] is mentally ill and dangerous because she evidences … [a] substantial probability of physical harm to others and a substantial probability of impairment or injury to herself or others due to impaired judgment.

¶22 The circuit court further found that Janice is a proper subject for treatment and added that: "The dangerousness has manifested or shown by a substantial likelihood, based on the subject's individual treatment, that the individual would be [a] proper subject for commitment if treatment [were] withdrawn." The court found that her dangerousness "is likely to be controlled with appropriate medication administered on an outpatient basis," and it ordered her commitment extended on an outpatient basis for another twelve months.

¶23 The circuit court further determined that Janice "is in need of medication or treatment" and such "will have a therapeutic value." It found that "[t]he advantages, disadvantages, and alternatives to this medication have been explained," but "[d]ue to mental illness, [Janice] is not competent to refuse psychotropic medication because [she] is substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her condition or to make an informed choice whether to accept or refuse psychotropic medications." The court ordered Janice "to take all psychotropic medications as prescribed by your treatment provider" and "[s]chedule, keep, and attend all appointments recommended by the [WIS. STAT. §] 51.42 Board and your treatment provider."

¶24    Janice appeals.

## DISCUSSION

¶25    An individual is a proper subject for recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous to herself or others. *See **D.J.W.***, 391 Wis. 2d 231, ¶32; § 51.20(1)(a), (13)(e).  Of these three, Janice only challenges the circuit court's determination that she is dangerous.

¶26    Whether the County met its burden of proof to support Janice's recommitment presents a mixed question of law and fact. *See **Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.  "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," ***D.J.W.***, 391 Wis. 2d 231, ¶24, and "we accept reasonable inferences from the facts," ***Winnebago County v. Christopher S.***, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted).  Whether the facts satisfy the statutory standard, however, is a question of law we review independently.  ***D.J.W.***, 391 Wis. 2d 231, ¶25; ***Outagamie County v. Melanie L.***, 2013 WI 67, ¶39, 349 Wis. 2d 148, 833 N.W.2d 607.  On appeal, Janice has the burden to show that the circuit court erred. *See **Gaethke v. Pozder***, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381.

*Sufficiency of Evidence for Commitment Order*

¶27    Janice first contends "[t]he County failed to present sufficient evidence of [her] current dangerousness"; ultimately, that it "failed to present sufficient evidence to prove Janice would be a proper subject for commitment if treatment were withdrawn."  We disagree.

12

¶28 To support a commitment order, a circuit court need only conclude that the person is dangerous under one of the five dangerousness standards of WIS. STAT. § 51.20(1)(a)2. *See Sauk County v. S.A.M.*, 2022 WI 46, ¶5, 402 Wis. 2d 379, 975 N.W.2d 162 ("If the government presents clear and convincing evidence that the committed person remains mentally ill, treatable, and dangerous under one of the five standards ... then the court must order that person recommitted ...."). Janice recognizes that the court "concluded that [she] [i]s dangerous under … §§ 51.20(1)(a)2.b. and c." "by way of the recommitment alternative … § 51.20(1)(am)." *See S.A.M.*, 402 Wis. 2d 379, ¶32. Under these provisions, a person is dangerous if, based on her treatment history, she would again evidence "a substantial probability of physical harm to other individuals" or "physical impairment or injury to … herself or other individuals" if treatment were withdrawn. Secs. 51.20(1)(a)2.b.-c., 51.20(1)(am).

¶29 Janice contends Andrade

> did not provide any information that would suggest that [Janice] continues to hold those unusual beliefs regarding curved spines or that others should worship her. The fact that [Janice] once engaged in those beliefs or behaviors is not sufficient to prove that she is currently dangerous. To prove *current* dangerousness, the County needed to show how those behaviors—occurring over two years ago—make her dangerous to herself or others today.

But, as WIS. STAT. § 51.20(1)(am) makes clear, the County does not need to show that Janice currently holds those same unusual beliefs, as she has been on medication to control such peculiarities since her initial commitment. This is why para. (am) exists. *See Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509 (pointing out that § 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such

13

behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur"). As long as the County shows, as it has here, that there is a substantial likelihood that the individual would be a proper subject for commitment if treatment were withdrawn, the dangerousness requirements of "a recent overt act, attempt or threat" (§ 51.20(1)(a)2.b.) and "pattern of recent acts or omissions" (§ 51.20(1)(a)2.c.) are satisfied. To this point, Andrade clearly opined in her testimony and admitted report that if treatment were withdrawn, Janice would "quickly" decompensate and again be a danger to the "community, [her] family, and herself."[4] *See J.W.K.*, 386 Wis. 2d 672, ¶19 ("[P]aragraph (am) functions as an alternative evidentiary path, reflecting a change in circumstances occasioned by an individual's commitment and treatment."). Further, as we have recognized,

> neither … an expert [n]or circuit court [is required] to speculate on the precise course of an individual's impending decompensation by identifying specific *future* dangerous acts or omissions the individual might theoretically undertake without treatment…. Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions ….

*Winnebago County v. S.H.*, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761.

---

[4] Janice writes: (1) while Weber and Andrade testified Janice desired to stop receiving the prescribed medication, Weber also testified that Janice had been medication compliant; (2) the circuit court disapprovingly noted Weber had only met with Janice twice in two years and found it "odd" the County had reduced the frequency and dosage of medication yet sought recommitment; (3) the court criticized portions of testimony as "not stellar"; and (4) the court relied on another doctor's report that "was never introduced into the record." Because Janice fails to develop an argument with regard to any of these points, we do not address them. *See ABKA Ltd. P'ship v. Board of Rev.*, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) ("[We] will not address undeveloped arguments.").

¶30 Janice's behavior in late 2021 and early 2022 supported her initial commitment, and she does not argue to the contrary. Since receiving medication, she has not engaged in additional concerning behavior because, as Andrade testified, the Abilify injections make it possible for her to successfully remain in the community. The circuit court's finding in this regard is sufficiently supported.

¶31 Relying on our supreme court's decision in **D.J.W.**, 391 Wis. 2d 231, Janice also complains her right to due process was short-changed because "[t]he circuit court failed to make specific factual findings on dangerousness with reference to a subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2." The **D.J.W.** decision, however, was driven by the fact that "[i]t was not clear at either the initial commitment hearing or the extension hearing on which subdivision paragraph of … § 51.20(1)(a)2. the commitment was based." **D.J.W.**, 391 Wis. 2d 231, ¶36. In this case, however, the court's extension order was based unambiguously on § 51.20(1)(a)2.b. and c. by way of the recommitment alternative § 51.20(1)(am).[5]

¶32 Following the hearing, the circuit court entered a written order extending Janice's commitment in which the court made it clear it determined

---

[5] Indeed, in her brief-in-chief, Janice begins the "**ARGUMENT**" section with "[i]n this case, the court concluded that [Janice] was dangerous under [WIS. STAT] §§ 51.20(1)(a)2.*b.* and *c.* The court indicated that this dangerousness was manifested by a substantial likelihood, based on [Janice's] treatment history, that [she] would be a proper subject for commitment if treatment were withdrawn," tracking the language of § 51.20(1)(am). (Emphasis added.) Janice later modifies her certainty some, stating "the circuit court *appeared* to find dangerousness based on … §§ 51.20(1)(a)2.b. and c." (Emphasis added.) In her reply brief, Janice further states that she "acknowledges that the circuit court did find that [she] evidenced '[a] substantial probability of physical harm to others and a substantial probability of impairment or injury to herself or others due to impaired judgment,' with language that appears to largely track that of … § 51.20(1)(a)2.b.-c." She also modestly appears to admit that the court "may have accurately noted the [subdiv. paras.] under which it found [her] dangerous." Here, there was no uncertainty under which subdivision paragraphs of § 51.20(1)(a)2 the court determined Janice was dangerous.

Janice dangerous "because [she] evidences one or more of the standards … under [WIS. STAT.] § 51.20(1)(a)2. in combination with § 51.20(1)(am)." It checked boxes indicating she evidences "a substantial probability of physical harm to other individuals" and "a substantial probability of physical impairment or injury to … herself or other individuals due to impaired judgment," respectively corresponding to § 51.20(1)(a)2.b. and c., "[a]s manifested or shown by … a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn," corresponding to § 51.20(1)(am). This order tracked comments made by the court during the hearing.

¶33 The circuit court made clear that there was "no testimony really refuting what [Weber and Andrade] have testified [to] today, with what has been said, and the history of what brings us here today: from the underlying reports of the incident at the waterpark, the history of delusions and hallucinations." The court found that the unrefuted testimony of Weber and Andrade established "the grounds for the extension of commitment." The testimony and evidence presented to the court provided ample support for its conclusion that Janice is currently dangerous, i.e., that if treatment were withdrawn, she would satisfy WIS. STAT. § 51.20(1)(a)2.b. or c.

¶34 Janice further states that "the court made no factual findings regarding how [the standard of a substantial probability that Janice would become a proper subject for commitment if treatment were withdrawn] was evidenced." But, the circuit court ultimately and obviously did credit Andrade's testimony to this effect, and she had unambiguously opined that Janice would "quickly" decompensate if her medication were withdrawn and become a danger again to the community, her family and herself. Furthermore, it is well established that we

16

may affirm the court's decision if the record evidence clearly supports it, *see Kraemer v. Kraemer*, 67 Wis. 2d 319, 320, 227 N.W.2d 61 (1975); *see also State v. Margaret H.*, 2000 WI 42, ¶37, 234 Wis. 2d 606, 610 N.W.2d 475, which is the case here. The County presented ample evidence, both in testimony and admitted reports, showing Janice's concerning threats to harm certain persons in specific ways and her direct engagement in aggressive and/or uninvited physical contact—physically fighting with her daughter and son-in-law at a hotel; lifting up strangers' shirts "unwanted and unannounced," which could easily lead to aggressive physical retaliation against her, as Andrade noted; grabbing a female neighbor's arm and making aggressive physical comments and threats toward her, including threatening to "cut off [her] limbs and stating that [the neighbor] must die"; and screaming "I have got my gun loaded," which neighbors interpreted "as a threat that she was going to start shooting," to name a few.

*Sufficient evidence for medication order*

¶35 "[U]nder WIS. STAT. § 51.61, a person has the right to refuse medication unless a [circuit] court determines that the person is incompetent to make such a decision." *Melanie L.*, 349 Wis. 2d 148, ¶53. "[T]he County bears the burden of proof on the issue of competency in a hearing on an involuntary medication order." *Id.*, ¶94.

¶36 As relevant here, the County establishes a person's incompetency to refuse medication by proving by clear and convincing evidence that due to mental illness

> *and after the advantages and disadvantages of and alternatives to accepting the particular medication ... have been explained to the individual*, one of the following is true:

17

> a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to … her mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment.

*See* WIS. STAT. § 51.61(1)(g)4. (emphasis added); WIS. STAT. § 51.20(13)(e). Janice argues we must vacate the involuntary medication order because "the County failed to present sufficient evidence that anyone adequately explained the advantages, disadvantages, and alternatives to medications" to her. We disagree.

¶37     In her testimony, Weber agreed that the psychiatrist on Janice's treatment team, Malinovic, "routinely discuss[es] the advantages, disadvantages, and alternatives of Abilify" with Janice. This is also supported by Weber's admitted report, which further indicates Malinovic last discussed the advantages and disadvantages with Janice less than two months before the final hearing. Andrade testified that she, too, explained the advantages and disadvantages of Abilify to Janice, detailing in her report the specific advantages and disadvantages she explained to her. Andrade testified that she did not discuss alternatives with Janice "[b]ecause I don't believe there are any alternatives to treatment for schizophrenia. There [is] complementary help often given but medications are the treatment for schizophrenia."

¶38     While Janice would like us to invalidate the medication order because Andrade did not discuss alternatives with Janice, Andrade clearly testified that no sufficient alternatives to medication exist for schizophrenia and that is why she did not explain any to Janice. Understandably, Andrade could not discuss

with Janice alternatives that do not exist. Moreover, the evidence indicated that Malinovic did "routinely discuss … alternatives of Abilify" with Janice.

¶39 Janice made it abundantly clear, repeatedly and consistently, that despite the obvious and extensive evidence to the contrary, she did not believe she had a mental illness and did not believe she needed medication. Even though the record clearly shows she was benefitting from and able to stay in the community safely because of the Abilify, she opposed the medicine at every opportunity, even making preposterous claims that it prevented her from seeing, despite the fact she had no problem seeing.

¶40 In *Melanie L.*, our supreme court stated that it is "logical[]" that "if a person cannot recognize that he or she has a mental illness, ... the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness." 349 Wis. 2d 148, ¶72. As the evidence showed, that is the case here.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.